**NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY et al., Appellees-Cross-Appellants,**

v.

**BOARD OF REVIEW OF CITY AND COUNTY OF DUBUQUE, Iowa, Appellant-Cross-Appellee.**

No. 2–56541.

Supreme Court of Iowa.

Jan. 22, 1975.
Rehearing Denied March 14, 1975.

R. N. Russo and Fuerste, Carew & Coyle, Dubuque, for appellant-cross-appellee.

O'Connor, Thomas, Wright, Hammer, Bertsch & Norby, Dubuque, for appellees-cross-appellants.

Heard by MOORE, C. J., and MASON, REES, UHLENHOPP and REYNOLDSON, JJ.

REYNOLDSON, Justice.

On this appeal and cross-appeal we review and affirm a district court decision relating to property tax assessments on certain real estate in downtown Dubuque, Iowa.

The land involved is owned by appellee-cross-appellant Northwestern Mutual Life Insurance Company and was leased to a Davenport bank (as trustee of a designated trust) for a term of 99 years commencing February 15, 1956 for an annual rental of $15,600. The trustee bank erected a four-story building on the land in 1957 and leased it to J. C. Penney Company for a 25 year term beginning August 1, 1958, with three 10 year renewal options. The rental was three percent of net retail sales. Sales in the 1965–1972 period were approximately level at slightly more than $4,000,000 annually.

In 1962 the individual appellees-cross-appellants (property owners) acquired the trustee bank's interest as lessee in the underlying land, and purchased the building located at 855 Main Street, for $995,321.11.

Subsequently, Dubuque experienced the now-classic shift of retail business from downtown to suburban areas. The Plaza 20, the Asbury Square, and especially the Kennedy Mall shopping centers on the west side drew major stores from the former business district and attracted retailers who had never before operated in Dubuque.

The downtown business area was characterized by the familiar blight of empty buildings, the dust and disruption of urban renewal demolition, vacant lots, and, according to a knowledgeable witness, a "tremendous decrease in the value of downtown properties, both in land and improvements."

The Board of Review of the City and County of Dubuque accorded this situation some recognition in 1970 when it decreased the value of all land on Main Street between 7th and 9th Streets by 50 percent. No comparable reduction was allowed on buildings in the blighted area.

These property owners protested their property tax assessments for 1970, 1971 and 1972 to the board. Allegations of the protests asserted excessiveness, and inequality in relation to allegedly comparable proper-

ties. See § 441.37(1), (2), The Code. When the protests were rejected these property owners filed separate appeals which were consolidated for trial in district court.

The "fair market" values fixed by the assessor were: 1970, building $875,425, land $162,985, total, $1,038,410; 1971 and 1972, building $875,425, land $81,492, total $956,-917. Property owners contended these values for all three years should have been $450,000 for the building and $50,000 for the land, a total of $500,000.

Trial court found the other properties relied on to demonstrate the alleged inequity were not comparable. But on the claim of excessiveness, trial court determined the fair market value in each of the three years to be $590,000 for the building and $195,000 for the land, a total of $785,000.

Appealing, the board asserts evidence submitted by the property owners reflects nothing more than a difference of opinion by appraisers on the rate to be employed to develop a market value using the income capitalization appraisal method, and is insufficient to sustain a reduction in the assessor's determination of fair market value.

Cross-appealing, property owners contend trial court had a duty to use the capitalization rate supported by the greater weight of evidence, and further, the inequitable assessment of the subject property in relationship to other properties warrants a further reduction in assessment to a total market valuation of $600,000.

█ I. Our review is de novo. Section 441.39, The Code; Power v. Regis, 220 N.W.2d 587, 589 (Iowa 1974); Wunschel v. Board of Review, Carroll County, 217 N.W.2d 576, 577 (Iowa 1974). Although we are not bound by trial court's findings on credibility of witnesses, we give weight to such findings. Harper v. Coad, 191 N.W.2d 682, 688 (Iowa 1971); Rule 344(f)(7), Rules of Civil Procedure.

II. Much of the pertinent statutory law is contained in § 441.21, The Code. Relevant portions of that statute were set out in Wunschel v. Board of Review, Carroll County, supra, at 577, 578, and Tiffany v. County Bd. of Rev. In and For Greene Co., 188 N.W.2d 343, 345 (Iowa 1971). This enactment equates "actual value" with "market value", defines "market value" by the willing buyer-willing seller formula, and places the burden of proof upon the complainant attacking the assessment as excessive, inadequate, inequitable or capricious unless and until complainant produces competent evidence by at least two disinterested witnesses that the market value is less than that determined by the assessor.

█ There is no presumption as to the correctness of the valuation of assessment appealed from. Section 441.39, The Code. The taxpayer no longer has the burden to prove that a grossly excessive valuation was made which resulted from the will rather than the judgment of the assessor. Tiffany v. County Bd. of Rev. In and For Greene Co., supra at 347. Further, contrary to the board's argument, " * * * the taxpayer is no longer required to prove, in order to prevail, that more is involved than a difference of opinion * * *." Maytag Company v. Partridge, 210 N.W.2d 584, 596 (Iowa 1973).

With these rules before us, we turn to a consideration of the evidence before trial court when it modified the assessment of the subject property.

III. Property owners called two expert witnesses. J. T. Willits of Davenport, Iowa, age 61, was in the business of real estate appraisals. He was a member and had served as officer of numerous state and national appraisal organizations. At trial time he was on the board of governors of the American Institute of Appraisers. He was a licensed real estate broker in Iowa and Illinois. He was unquestionably qualified by reason of education, training and experience and had made fair market value appraisals for urban renewal acquisitions for the City of Dubuque.

Property owners' witness Russell Fuhrman, of Dubuque, age 31, was a licensed

real estate broker in Iowa and Illinois, specializing in commercial properties. He had sold major business properties both in the downtown and suburban areas of Dubuque, and displayed the most convincing knowledge of the retail business movement away from Main Street and its impact on the value of remaining properties.

The board called as an expert Thomas Valentine, age 39, of New York. He had been an appraiser and project manager in various states for Clemenshaw Company until 1971, then formed his own company. More than 95 percent of his experience had been related to appraisals for assessment tax purposes. He was a member of the Society of Real Estate Appraisers and of five organizations of assessing officers. In 1966 and subsequent years he had done appraisals for the city and county assessor in Dubuque.

As will be noted below, none of these experts survived cross-examination unscathed, perhaps due to attempts to justify already reasoned judgments of market value through the mathematical calculations required by an income capitalization approach to the appraisal problem.

Willits opined a potential buyer would anticipate placing a 70 percent purchase mortgage on the property. He testified the available interest rate during the years in question was 9 percent. He further hypothecated the buyer would expect a 15 percent return on his 30 percent equity in the premises. He therefore arrived at the following capitalization rate:

| | |
|---|---|
| Mortgage of 70 percent at 9 percent interest | = .063 |
| Equity of 30 percent at 15 percent interest | = .045 |
| Depreciation rate to recapture cost in 50 years | = .020 |
| Total rate | .128 = 12.8 percent |

His application of a rounded-down rate of 12 percent to a net income amount which also erroneously included a depreciation factor produced a valuation unsupportable under the income approach but one which he nonetheless maintained was market value confirmed by the market and reproduction cost appraisal methods: $495,000, broken down to $195,000 for the land and $300,000 for the building.

Giving all three methods equal weight, Fuhrman valued the building at $484,333 and the land at $45,600. In his land valuation he did not take into account the 99 year lease with an annual rental of $15,600, apparently reasoning this lot should be valued as other property not under lease. His income capitalization approach to a building appraisal was impeached by his inclusion of mortgage interest as an expense, although he offset this by a lower capitalization rate. On the other hand, Fuhrman's pragmatic, detailed testimony, based on making a livelihood by sales of commercial properties in the Main Street area, added authenticity to his ultimate market valuation of the subject building. Particularly pertinent was his bleak description of the demise of retail business and declining valuations in the downtown district, persuasive that Penney Company would not exercise any of its lease renewal options.

The board's witness Valentine used the income capitalization approach, paralleling Willits' rationale, with the following rates:

| | |
|---|---|
| Mortgage of 70 percent at 8 percent interest | = .056 |
| Equity of 30 percent at 10 percent interest | = .030 |
| Depreciation | = .020 |
| Total rate | .106 = 10.6 percent |

Rounding this rate down to 10.5 percent, Valentine arrived at a building valuation of $722,724, a land valuation of $195,000, a total of $917,724 which he rounded down to $917,700.

Valentine's use of an 8 percent mortgage interest was not based on any knowledge of prevailing interest rates in the community at that time, but was apparently a conjectural increase from a known rate existing in 1956. On cross-examination he became very evasive when repeatedly questioned whether a knowledgeable buyer might believe the Penney lease would be terminated at the end of the original term in 1983. Finally pressed, he responded,

> "I have made the projection based on the economic life of the building *under normal circumstances*, and that the lease is in effect at the present time, and that there is a past history of it being paid, *and of no reason to see that it's going to be terminated* \* \* \*." (Emphasis supplied.)

As we weigh the record, circumstances affecting the economic life of this building were not normal, and there was overwhelming evidence it could not be anticipated the lease would be extended. In face of judicially-noticed inflationary price increases, Penney's virtually steady net retail sales volume actually indicates fewer sales at this location. Clearly, an intelligent potential buyer of the building would demand a more rapid recovery of his investment than that indicated by Valentine's capitalization rate.

■ As we view it, trial court was justified in applying Willits' initial capitalization rate (12.8%) to the undisputed net effective income of $75,885. This produced a building valuation of $592,851, which the court rounded off at $590,000.

On this record trial court also was warranted in accepting the $195,000 valuation Willits and Valentine placed on the land through capitalization of the $15,600 annual income.

We reach these results without modifying trial court's conclusion, which may have been based on the above technical problems encountered by property owners' witnesses, that the burden of persuasion did not shift to the board under § 441.21 criteria. See Wunschel v. Board of Review, Carroll County, supra, 217 N.W.2d at 578. We agree with trial court that nonetheless the property owners carried their burden of proof to the extent of the fair market values fixed in the decision appealed from.

IV. Property owners complain with some justification the board unfairly refused to reduce the value of their business building in 1970 when it reduced downtown land valuations by 50 percent. They further urge a discrimination against their building when the assessor gave certain percentage "economic discounts" to the market value of described new buildings in Kennedy Mall shopping center. Other inequities were alleged with respect to other downtown buildings.

■ While the question of comparability to other downtown properties is close, we believe trial court rightly determined an insufficient foundation was laid to consider these alleged inequities. See Power v. Regis, supra, 220 N.W.2d at 590; Maxwell v. Shivers, 257 Iowa 575, 579–580, 133 N.W.2d 709, 711 (1965).

We hold trial court's valuations of both the land and building must stand.

Affirmed.